IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| ANTHONY A. LEE,<br><br>              PLAINTIFF.<br><br>DANA CORPORATION,<br><br>              DEFENDANT. | CIVIL ACTION NO. _____<br><br>HON. |

_____/
CARLA D. AIKENS, P.C.
CARLA D. AIKENS (P69530)
ASHLEY J. BURRESS (P79614)
*Attorneys for* Plaintiff
615 Griswold Street, Suite 709
Detroit, Michigan 48226
carla@aikenslawfirm.com
ashley@aikenslawfirm.com
Phone: (844) 835-2993
Fax: (877) 454-1680

_____/
*There are no other prior or pending matters between these parties.*

## COMPLAINT

PLAINTIFF, ANTHONY A. LEE, by and through his attorneys, CARLA D. AIKENS, P.C., submits the following Complaint against DEFENDANT, DANA CORPORATION.

## JURISDICTION

1.    At all relevant times, Plaintiff, Anthony A. Lee, was a resident of the County of Oakland, State of Michigan.

1

2.      Defendant, Dana Corporation., has a place of continuous and systematic place of business at 4440 N. Atlantic Boulevard, in the City of Auburn Hills, County of Oakland, State of Michigan.

3.      All relevant actions giving rise to this complaint took place in Oakland County, Michigan.

4.      This action is brought in this Court on the basis of federal question jurisdiction, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq.

5.      Pursuant to 28 U.S.C. §1367, this Court has supplemental jurisdiction over Plaintiff's state law claims.

## VENUE

6.      Venue is proper in the Eastern District of Michigan pursuant to Section 706(f)(3) of Title VII, 42 U.S.C. § 2000e-5(f)(3), because the unlawful employment discrimination giving rise to Plaintiff's claims occurred in this District.

## STATEMENT OF FACTS

7.      Plaintiff was hired by Defendant as a factory worker dealing with automobile parts, on or around September 4, 2004.

8.      Plaintiff was hired in by Defendant making $12.33 per hour as a Hi-Lo driver.

9.      Plaintiff's performance afforded him increases in his wage. Upon his termination, he was making $18.50 per hour.

10.     Plaintiff was successful in his position as a Hi-Lo driver and remained in the position without incident until approximately 2016.

11.     In or about November 2016, Plaintiff was involved in a Hi-Lo collision. The Hi-Lo he was operating collided with a stationary object, and the Hi-Lo was damaged.

12. Plaintiff received disciplinary action for the collision and was removed from his position as a Hi-Lo operator.

13. In normal practice, a worker is placed on disciplinary action for six months and then they are allowed to reapply for their position.

14. Plaintiff, an African American male, was not afforded that opportunity.

15. Plaintiff witnessed a number of his white/Caucasian coworkers be reinstated after disciplinary actions, some of which were even more serious than his infraction.

16. Plaintiff, however, was never reinstated to his Hi-Lo position, even though he had over 12 years of experience.

17. Despite company policy, Plaintiff's disciplinary action was never removed from his record.

18. Plaintiff began applying for new Hi-Lo positions within the company.

19. Plaintiff was denied the positions. He was told that he was "not equipped to do the job."

20. After being denied an opportunity to be reinstated as a Hi-Lo driver, Plaintiff began to apply for Team Lead positions.

21. Again, Plaintiff was denied the opportunity to advance.

22. By denying Plaintiff both the Team Lead and Hi-Lo positions, Defendant denied Plaintiff the opportunity of an increased hourly wage rate.

23. Plaintiff began complaining to his managers. "Jim" and "Ralph" (both white/Caucasian males) about being denied a new position.

24. The relationship between Plaintiff and his managers immediately became strained.

25. "Jim" and/or "Ralph" (last names unknown) would purposely assign Plaintiff to mandatory overtime, despite there being lower seniority employees and temporary workers who were supposed to receive the overtime first.

26. Plaintiff was being scheduled on so many mandatory shifts that he was being denied a day off from working.

27. When Plaintiff brought this to "Jim" and "Ralph's" attention, they failed to do anything to remedy the situation.

28. Receiving no aid from his supervisor, Plaintiff filed a complaint with Human Resources.

29. Throughout this time, "Jim" and "Ralph" made it a point to keep Plaintiff's schedule inconsistent. There would be scheduled for overtime with little, if any, notice. Other times, overtime would be removed from his schedule without him knowing.

30. In July of 2018, Plaintiff had volunteered for an overtime shift. Unbeknownst to him, his name was removed from the approved overtime list.

31. Plaintiff showed up and worked the overtime as scheduled, only to later be informed that he was terminated for working an unauthorized shift.

32. Several of his white/Caucasian coworkers would "pick up" overtime shifts without approval and would not be disciplined.

33. Plaintiff, through the assistance of his Union, was reinstated.

34. In August of 2018, Plaintiff was scheduled for mandatory overtime. He explained to his managers that he had been scheduled for too many shifts and would not be able to complete the overtime. He was given a "point," a form of disciplinary action, and was suspended for missing overtime.

35. During this time, Plaintiff was aware that a white/Caucasian employee failed to show up for mandatory overtime. The white employee missed three days of overtime and did not receive any disciplinary action.

36. In September of 2018, another Hi-Lo position was posted. Plaintiff immediately applied.

37. Fearful he would be denied once again, Plaintiff went to talk to Diane Ricevuto in Human Resources.

38. Plaintiff was informed that she would place him in the position only if he signed a "Settlement Agreement and Release" and agreed to waive any pending grievances or complaints he had.

39. Plaintiff refused to waive his rights. As such, the Hi-Lo position was given to a lower seniority employee.

40. It became clear to Plaintiff that he was being targeted. He was one of the only employees who was consistently assigned mandatory overtime and received disciplinary points.

41. If an employee received four "points," it was grounds for termination.

42. Plaintiff, either individually or with the assistance of his Union, had to constantly battle with management to have the "points" removed from his record.

43. In November of 2018, Plaintiff was once again assigned for mandatory overtime. Plaintiff immediately expressed to his managers that it was not his turn to do overtime again. He expressed that the managers had failed to rotate the overtime amongst the employees and passed over lower seniority employees. He also explained that he would have too many shifts with the addition of the overtime.

44. Neither his managers nor Human Resources did anything to remedy the situation.

45. Thereafter, Plaintiff was terminated on November 28, 2018.

46. Plaintiff filed a charge of discrimination with the Detroit office of the Equal Employment Opportunity Commission ("EEOC") on the basis of his (1) race; and (2) retaliation.

47. In a letter dated February 26, 2020, the EEOC issued Plaintiff a Notice of his Right to Sue.

48. Plaintiff requests relief as described in the Prayer of Relief below.

## COUNT I
### HARASSMENT & DISCRIMINATION ON THE BASIS OF PLAINTIFF'S RACE IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. 2000E *ET SEQ*. ("TITLE VII")

49. Plaintiff incorporates by reference all allegations in the preceding paragraphs.

50. At all material times, Defendant was an employer and Plaintiff was an employee covered by, and within the meaning of, Title VII, as amended.

51. Defendant's conduct, as alleged herein, violated Title VII of the Civil Rights Act of 1964, which makes it unlawful to harass or discriminate against an employee on the basis of that employee's race.

52. A respondeat superior relationship existed because Plaintiff's managers "Jim" and "Ralph" had the ability to undertake or recommend tangible decisions affecting Plaintiff and/or the authority to direct Plaintiff's daily work activity, as alleged throughout this complaint.

53. Plaintiff is African American, and, as a result, he is a member of a protected class pursuant to Title VII.

54. Plaintiff was subjected to offensive communication and conduct on the basis of membership in this protected class.

55. Specifically, upon information and belief, employees of other races have never been terminated for missing overtime.

56. Moreover, white/Caucasian employees were routinely and immediately reinstated to their prior positions after disciplinary actions. This was the same even after missing mandated overtime, which was one of the alleged reasons Plaintiff was given for his termination.

57. Defendant and its agents' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff's rights.

58. Plaintiff notified Defendant, through its agents, of the unwelcomed conduct and communication and Defendant failed to remedy the unwelcomed conduct or communication.

59. The unwelcomed conduct or communication was intended to or in fact did substantially interfere with Plaintiff employment and created an intimidating, hostile, and/or offensive work environment, as alleged in the statement of facts.

60. As a proximate result of the Defendant's discriminatory actions, Plaintiff have suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

61. As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proven at trial.

62. Plaintiff requests the relief as described in the Prayer for Relief below.

## COUNT II
## DISCRIMINATION ON THE BASIS OF RACE IN VIOLATION OF THE MICHIGAN ELLIOTT-LARSEN CIVIL RIGHTS ACT MCL 37.2101 et seq. ("ELCRA")

63. Plaintiff incorporates by reference all allegation in the preceding paragraphs as if there were alleged herein.

64. At all material times, Plaintiff was an employee and Defendant was his employer covered by, and within the meaning of ELCRA.

65. Defendant further, is a covered "employer" within the meaning of Elliot Larsen Civil Rights Act (ELCRA).

66. A respondeat superior relationship existed between Plaintiff and Defendant, through its management, which had the ability to make decisions impacting Plaintiff's work activity.

67. Defendant's conduct, as alleged herein, violated the Michigan Elliot-Larsen Civil Rights Act, MCL 37,2101 et seq., which makes it unlawful to harass or discriminate against an employee on the basis of their race.

68. Plaintiff is a member of a protected class being of African American decent.

69. Plaintiff was subjected to offensive communication or conduct on the basis of his membership in this protected class.

70. The communication and conduct was unwelcomed.

71. The unwelcomed conduct or communication was intended to or in fact did substantially interfere with the Plaintiff's employment or created an intimidating, hostile, or offensive work environment as alleged throughout this complaint.

72. As a direct and proximate result of Defendant's wrongful acts and omission, Plaintiff has sustained loss of earning, earning capacity, and fringe benefits, and has suffered mental anguish, emotional distress, humiliation and embarrassment.

73. Plaintiff requests the relief as described in the Prayer for Relief below.

## COUNT III
## RETALIATION IN VIOLATION OF TITLE VII

74. Plaintiff incorporates by reference all allegations in the preceding paragraphs.

75. At all material times, Defendant was an employer and Plaintiff was an employee covered by, and within the meaning of, Title VII, as amended.

76. A respondeat superior relationship existed because Plaintiff's managers "Jim" and "Ralph" had the ability to undertake or recommend tangible decisions affecting Plaintiff and the authority to direct Plaintiff's daily work activity, as alleged in the statement of facts.

77. Defendant's conduct, as alleged herein, violated Title VII, which makes it unlawful to harass or retaliate against an employee for engaging in protected activity.

78. Plaintiff engaged in protected activity, as more fully laid out in the statement of facts, including, but not limited to, when he filed complaints regarding Defendant's racially motivated disciplinary actions.

79. Defendant, through their agents, had knowledge that Plaintiff engaged in protected behavior because Plaintiff would address his concerns with his managers and file formal complaints with Human Resources.

80. After Plaintiff engaged in the protected activities, Defendant's agents thereafter harassed Plaintiff and took several adverse employment actions because of that activity, as

alleged in the statement of facts and herein, subjecting Plaintiff to severe and pervasive retaliatory harassment by a manager, culminating all the way to the termination of Plaintiff.

81.   Defendant and its agents' unlawful actions were intentional, willful, malicious and/or done with reckless disregard of Plaintiff's rights.

82.   Plaintiff notified Defendant and its agents of the unwelcomed conduct and communication, however, Defendant failed to remedy the same.

83.   As a proximate result of the Defendant's discriminatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

84.   As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proved at trial.

85.   Plaintiff request the relief as described in the Prayer for Relief below.

## COUNT IV
## RETALIATION IN VIOLATION OF THE ELCRA

86.   Plaintiff incorporates by reference all allegations in the preceding paragraphs.

87.   At all material times, Plaintiff was an employee, and Defendant was an employer covered by, and within the meaning of, the ELCRA.

88.   A respondeat superior relationship existed because his managers, "Jim" and "Ralph," had the ability to undertake or recommend tangible decisions affecting Plaintiff and the authority to direct all of Plaintiff's daily work activity, as alleged in the statement of facts.

89.   Moreover, a respondeat superior relationship existed because "Jim" and "Ralph" had the ability to undertake or recommend tangible decisions affecting Plaintiff, and the authority to direct Plaintiff's daily work activities, as alleged in the statement of facts.

90. Defendant's conduct, as alleged herein, violated the ELCRA which makes it unlawful to retaliate against an employee who has engaged in protected activity.

91. Plaintiff engaged in protected activity, as more fully laid out in the statement of facts, including, but not limited to, when he consistently and continually brought to his manager's and Human Resources' complaints about the discriminatory scheduling and racially biased disciplinary systems.

92. After Plaintiff engaged in protected activity, Defendant's agent thereafter retaliated against Plaintiff and took several adverse employment actions against him culminating in Plaintiff's termination.

93. Defendant and its agents' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff's rights.

94. Plaintiff notified Defendant's agents of the unwelcomed conduct or communication and Defendant failed to remedy the unwelcomed conduct or communication.

95. As a proximate result of Defendant's discriminatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

96. As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proved at trial.

97. Plaintiff requests relief as described in the Prayer for Relief below.

## COUNT IV
## WRONGFUL DISCHARGE IN VIOLATION OF MICHIGAN PUBLIC POLICY

98. Plaintiff incorporates by reference all allegations in the preceding paragraphs.

99. It is the longstanding public policy of the State of Michigan that there are three exceptions to the employment at-will doctrine, and an employee can be found to be liable for wrongful discharge, they are:

> (1) explicit legislative statements prohibiting the discharge, discipline or other adverse treatment of employees who act in accordance with a statutory right or duty;
> (2) where the alleged reason for the discharge was the failure or refusal of the employee to violate a law in the course or employment; and
> (3) where the reason for the discharge was the employee's exercise of a right conferred by a well-established legislative enactment.

100. Plaintiff's discharge came as the result of him refusing to sign a document from Human Resources that would force him to waive his rights to engage in protected activities in order to receive a position that he was rightfully entitled.

101. Moreover, ELCRA has explicit language that prohibits the discharge, discipline, or other adverse treatment of Plaintiff, however, Defendant retaliated against Plaintiff for attempting to protect his rights laid out in the statute.

102. As a result of Defendant's actions, and consequent harm, Plaintiff has suffered such damages in an amount to be proven at trial.

103. Plaintiff requests relief as described in the Prayer for Relief below.

## PRAYER FOR RELIEF

PLAINTIFF, Anthony A. Lee, respectfully requests that this Court enter judgment against Defendant as follows:

1. Compensatory damages;
2. Exemplary damages;
3. An award of lost wages and the value of fringe benefits, past and future;
4. An award of interest, costs, and reasonable attorney fees, and equitable relief; and

5.  Any other relief permitted as set forth in the Acts hereunder.

          Respectfully Submitted by:

          CARLA D. AIKENS, P.C.

          */s/ Carla D. Aikens*_____
          Carla D. Aikens (P69530)
          Ashley J. Burress (P79614)
          Attorneys for Plaintiff
          615 Griswold Street, Suite 709
          Detroit, MI 48226
          (844) 835-2993

Dated: May 21, 2020