## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

ANTHONY LEE,

       Plaintiff,               Case No. 20-11282

v.

                     District Judge Denise Page Hood

DANA INCORPORATED,

       Defendant.

_____ /

## ORDER GRANTING DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT (ECF No. 19)
## And
## DISMISSING ACTION

## I.    BACKGROUND

### A.  Procedural Background

On May 21, 2020, Plaintiff Anthony Lee filed an employment discrimination

complaint against Defendant Dana Incorporated ("Dana") (ECF No.1), followed by

an amended complaint on May 25, 2020 (ECF No. 2). The amended complaint

alleges racial discrimination and harassment in violation of Title VII of the Civil

Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.* (Count I); racial

discrimination in violation of Michigan's Elliott-Larsen Civil Rights Act

("ELCRA"), M.C.L. § 37.2101 *et seq.* (Count II); Retaliation in violation of Title

VII (Count III); Retaliation in violation of ELCRA (Count IV); and wrongful discharge in violation of Michigan public policy (Count V).[1] On December 28, 2020, Dana filed an answer to the amended complaint, with affirmative defenses (ECF No. 11). Discovery closed on October 4, 2021, and Defendant Dana filed its motion for summary judgment on November 4, 2021 (ECF No. 19). Plaintiff filed his response on November 24, 2021 (ECF No. 21) and Dana filed its reply brief on December 8, 2021 (ECF No. 22).

### B. Factual Background

In his amended complaint, Plaintiff alleges that he began employment with Dana as a factory worker on or around September 4, 2004, specifically being hired as a Hi-Lo driver. (ECF No. 2, PageID.15, ¶¶ 7-8). He states that he remained in that position "without incident" until approximately 2016. (*Id*., PageID.16, ¶ 10). In November of 2016, he was involved in a Hi-Lo collision, after which he received disciplinary action and was removed from the Hi-Lo position. (*Id*., ¶¶ 11-12). Plaintiff alleges that normally, a worker is placed on disciplinary action for six months and then allowed to reapply for the position, but that he, an African American male, was not given that opportunity, even though he witnessed Caucasian workers being reinstated after even more serious infractions. (*Id*., ¶ ¶ 13-

---

[1] The amended complaint mis-labels this fifth count as Count IV.

16). Plaintiff alleges that despite company policy, the disciplinary action was never removed from his record, and he was denied the opportunity to not only be reinstated to the Hi-Lo position, but to advance to a Team Lead position. This effectively denied him the opportunity for an increased hourly wage. (*Id*., ¶¶ 18-22).

Plaintiff alleges that his relationship with his managers, Jim L/N/U and Ralph L/N/U, became strained after he complained to them about being denied the new position. (*Id*., PageID.17, ¶¶ 23-24). He states that these managers would purposely and improperly assign him to mandatory overtime although lower seniority and temporary workers ought to have received the overtime first. (*Id*., ¶ 26). Plaintiff states that he was given so much mandatory overtime that he was denied a day off from working, but when he brought this to Jim and Ralph's attention, they failed to do anything to remedy the situation. (*Id*., ¶¶ 26-27).  Plaintiff then filed a complaint with Human Resources ("HR"). (*Id*., ¶ 28).

Plaintiff alleges that in July of 2018, he volunteered for an overtime shift, but unbeknownst to him, his name was removed from the approved overtime list. He nevertheless worked the overtime shift and was later informed that he was to be terminated for working an unauthorized shift, even though several Caucasian workers would not be disciplined for working overtime shifts without approval. (*Id*., ¶¶ 30-32). With the assistance of his union, Plaintiff was reinstated (*Id*., ¶ 33).

Plaintiff alleges that in August of 2018, he was scheduled for mandatory overtime, but told his managers that he had been scheduled for too many shifts and would not be able to complete the overtime. As a result, he was given a disciplinary "point" and suspended for missing overtime. (*Id*., PageID.18, ¶ 34). He alleges that a Caucasian employee who failed to show up for mandatory overtime was not disciplined. (*Id*., ¶ 35).

In September of 2018, Plaintiff applied for another Hi-Lo position. Diane Ricevuto in HR informed him that she would place him in that position only if he signed an agreement to waive any pending grievances or complaints. He refused to do so, and the Hi-Lo position was given to a lower seniority employee. (*Id*., ¶¶ 36-39).

In November of 2018, Plaintiff was again assigned mandatory overtime and again complained to his managers that it was "not his turn" to do overtime and that they had failed to include lower seniority employees in the overtime schedule. He states that neither his managers nor HR did anything to remedy the situation. (*Id*., PageID.19, ¶¶ 43-44).

Plaintiff was fired on November 28, 2018. (*Id*., ¶ 45). He filed a charge with the Equal Employment Opportunity Commission ("EEOC") on the basis of race and

retaliation. (*Id.*, ¶ 46).  The EEOC issued a Notice of Right to Sue on February 26, 2020.  (*Id.*, PageID. ¶ 47).

Plaintiff was deposed on October 1, 2021. He testified that he was hired in at Dana on September 1, 2004. (ECF No. 19-4, PageID.155). He was familiar with Dana's attendance policy and understood that an employee would be subject to disciplinary actions depending on how many disciplinary "points" were received. A point would "roll off" after 12 months. (*Id.*, PageID.157).  The discipline for one point would be a verbal warning; for two points, a written warning; for three points a 3-day unpaid suspension; and for four points, termination of employment. (*Id.*). Plaintiff also testified that under company policy, if he had a complaint regarding racial discrimination or harassment, he should complain to HR or other management. (*Id.*, PageID.158).

Plaintiff testified that he began work at Dana as an assembly operator and became a forklift operator in 2006. *(Id.*, PageID.160). In 2012 he was a Team Leader and held that position for under one year. (*Id.*). In November of 2016, he was involved in a forklift accident in which he damaged a beam as well as the forklift.  As a result, he was removed from the Hi-Lo position and re-classified to assembly. (*Id.*, PageID.162-163). Plaintiff had two previous forklift accidents in 2014 and was disciplined for both. (*Id.*, PageID.164-165). After he was removed

from the position after the 2016 incident, he was never reinstated. He filed at least

one grievance related to not being reinstated.  In February of 2017, a union steward

filed a grievance on his behalf.  Plaintiff testified that this grievance was improperly

denied because Dana considered all three Hi-Lo related disciplinary actions.

Plaintiff testified that he thought a Hi-Lo discipline should drop off after six

months. (*Id.*, PageID.165). Plaintiff filed another grievance on August 21, 2018,

asking that he be reinstated to the Hi-Lo position. (*Id.*). Dana initially refused to

reinstate him. (*Id.*, PageID.166). In its second-level grievance response, Dana

agreed to a settlement to lift the indefinite suspension with five conditions,

including compliance with and understanding of safety rules and completion of a

training a certification course. The proposed written agreement stated, "The parties

understand this is a non-precedent and non-prejudiced settlement." (*Id.*,

PageID.166-167).[2] Plaintiff testified that he refused to accept the settlement because

he was verbally told that it would be a settlement of all his grievances, not just the

ones related to the Hi-Lo position. (*Id.*, PageID.168). He also testified that he did

not think he should have to complete a training and recertification, but that the

reason he did not accept the settlement was his belief that in doing so he would be

---

[2]  The proposed agreement has been filed as Defendant's Exhibit 11. (ECF
No.19-12, PageID.348).

waiving all his grievances and complaints. However, he acknowledged that such a provision was not in the written agreement. (*Id*., PageID.169).

Plaintiff testified that on November 7, 2018, he informed his supervisor that the overtime list was wrong, and that he would not work the mandatory overtime that he was assigned. He did not work that overtime shift. (*Id*., PageID.174).  On November 8, he also refused to work a mandatory overtime shift because of his belief that the list was wrong. (*Id*., PageID.175). On November 14, 2018, Plaintiff was told that he had three disciplinary points, and was given a three-day suspension. (*Id*., PageID.176). On November 23, he again refused to work a mandated overtime shift. He also refused to work an overtime shift on November 26, after which he was fired. (*Id*., PageID.176-177).

On December 6, 2017, Plaintiff filed a two-page complaint with HR in which he complained about being denied the Hi-Lo job and about the poor scheduling.  He also asked for a copy of his employment file. He did not raise any other issues in that complaint. (*Id*., PageID.181-182).

On January 2, 2018, Plaintiff filed another complaint, this time complaining that other employees were allowed to work overtime when he was not, resulting in lost wages. He testified that the other employees who were permitted to work were Ray Harman, Barris Hawkins, and Cindy Parks. (*Id*., PageID.182-184).  Plaintiff

also complained that George Asher, the Production Manager, spoke to him in an "unprofessional" tone by yelling at him, and that Asher created "a hostile work environment" by showing favoritism to other employees. He identified Russell Sterling, Art Dries, and Devon Williams as employees who were given preferential treatment, such as being permitted to operate the Hi-Lo. (*Id*., PageID.184-185). He added that Ben Hoyston, Jason Louganey, Chevelle Pete, Eddie White and Carolyn Singleton, who all had less seniority than he, were given the Hi-Lo positions while he was not. (*Id*., PageID.187-188).

Plaintiff testified that after he refused to sign the settlement agreement regarding the Hi-Lo position, he started accumulating the disciplinary points that culminated in his termination. In terms of his claim of harassment, he testified that he was harassed by his supervisors improperly composing the overtime lists and improperly giving him mandatory overtime, leading to the disciplinary points and ultimately to his termination. (*Id*., PageID.194).

Plaintiff testified that he believed the decision not to promote him to team leader and not to have the Hi-Lo position was based on his race because the management team that made the hiring decisions was an all-white panel. (*Id*., PageID.197-198). He testified that Tim Johns, Diane Ricevuto, Brenda Koeppe, Ralph, and Jim made the decision to fire him. He never heard these individuals

make any negative statements about African-American employees, but Ralph and Jim raised their voices in talking to him.  He also based his belief concerning racial discrimination on the treatment he received, i.e., getting disciplinary points. (*Id*., PageID.199-200).

Regarding the individuals that Plaintiff said received preferential treatment, he testified that Mario Harding, Michael Brantley, Ray Hardman, Barris Hawkins, Troy Lee, Devon Williams, Chevelle Pete, Eddie White, and Carolyn Singleton were African-American.  (*Id*., PageID.201-202).  Cindy Parks, Art Dreiss, and Ben Hoyston were white. (*Id.*).

Diane Ricevuto was deposed on September 22, 2021.  She was Dana's manager of Human Resources when Plaintiff was employed. (ECF No. 19-24, PageID.370). She testified that Dana had a zero-tolerance policy regarding harassment and retaliation. (*(Id.*).  She stated that Plaintiff was removed from his Hi-Lo position because of a serious accident in 2016, but about two years later they proposed allowing him to start posting for the position pursuant to a written agreement. She stated this was not a "last chance agreement," but was focused on the safety policies. She did not recall requiring Plaintiff to waive any pending grievances or complaints other than the one relating to the Hi-Lo situation.  (*Id*.,

PageID.385-386).  The union agreed.  (*Id.*).  However, Plaintiff refused to sign the agreement. (*Id.*, PageID.376).

Ms. Ricevuto testified that Plaintiff was not hired for any team lead positions because he did not meet the criteria, due to incurred disciplinary actions and attendance points. (*Id.*, PageID.383).  In terms of any errors in overtime scheduling, she stated that "everybody understands that if there's an overtime scheduling discrepancy, that they're not to take it into their own hands and decide, okay, the supervisor messed up on the overtime scheduling so I'm leaving, and employees are aware that they're not to leave otherwise they will get a point for leaving."  (*Id.*, PageID.384).  She said that the overtime scheduling was a challenge, and she "had employees complaining all the time about the overtime scheduling. And, again, it wasn't just Ant Lee, it was the whole, whole process, the whole overtime scheduling." (*Id.*, PageID.385). She did not recall any white employees not showing up for overtime and not being disciplined. (*Id.*).

Brenda Koeppe, the Senior Labor Relations Manager at Dana, was deposed on September 24, 2021. She testified that one of the qualifications for the team leader position is that the employee must not have any disciplines on his or her record, or more than two attendance points. (ECF No. 19-9, PageID.328-329). For the forklift position, an employee must be able and willing to be trained. (*Id.*,

PageID.329). Ms. Koeppe testified that Plaintiff did not have a basis for his claim regarding not being accepted to the team leader position because "he had more attendance points than is allowed for a team leader, and he also had discipline on his record." She stated that "those are two [factors] that would definitely have disqualified him from going further in the interview process." (*Id.*).  She testified that an attendance point drops off after one year. (*Id.*, PageID.332).

Ms. Koeppe testified that Plaintiff's Hi-Lo accident, in which he fell asleep and hit a beam, was very serious. In deciding to not allow an employee to return to the position, she looks at that person's total safety record, "[a]nd with the seriousness of the most recent incident, we felt that [Plaintiff] needed to be removed…from the motor vehicle…." (*Id.*, PageID.337).  She stated that "when we see that an employee is not operating the Hi-Lo or any other piece of equipment safely it's our responsibility to retrain or depending on the seriousness remove them from the position."  (*Id.*). She testified that she viewed a videotape showing that Plaintiff had fallen asleep at the time of the accident. (*Id.*).  She verified that the five absences that were used to justify Plaintiff's termination occurred on April 18, November 7, November 8, November 23, and November 28, 2018.  (*Id.*, PageID.339).  She identified an email from Ms. Ricevuto, dated November 13, 2018, with the subject line reading "Recommendation to terminate Anthony Lee."

11

On November 13, 2018, Plaintiff had three attendance points, which were not enough to support a termination. (*Id.*, PageID.341-342).  She also identified an email to her from her manager, Darryle Cummings, dated November 15, stating that he would review the details with the union and put them on notice that they intended to terminate Plaintiff. Ms. Koeppe replied, "Thanks, Darryle. We moved forward with the suspension for three points pending further review and verification of all attendance points." (*Id.*, PageID.342).[3] In the November 13, 2018 from Ms. Ricevuto to Ms. Koeppe and Mr. Cummings, with the subject being "Re: Recommendation to Terminate Anthony Lee," Ms. Ricevuto states, "We have reason to believe that Ant Lee is preparing a discrimination claim against Dana/UAW. He recently requested a copy of his file in which I made a duplicate copy of what I gave him."  (ECF No. 21-13, PageID.548-549).

Ms. Koeppe testified that Plaintiff was fired solely because of the attendance violations. (*Id.*, PageID.344).

Ms. Ricevuto's affidavit is appended to Dana's reply brief (ECF No. 22-4) as Exhibit 3. She states that in the November 13, 2018 email to Koeppe and Cummings regarding the Plaintiff's possible termination, she referenced that the

---

[3] The complete email chain is found at Plaintiff's Exhibit 13 (ECF No. 21-13, PageID.547-549).

company had reason to believe that Plaintiff was preparing a discrimination claim against the company. (ECF No. 22-4, PageID.667-668, ¶ 8).  She states that her purpose in doing so "was to inform the Labor Relations team of the potential issue and ensure that the Company must review and verify that any basis for his termination was based on legitimate business reasons." (*Id.*, PageID.668, ¶ 9).  She states that Dana did not then decide to terminate Plaintiff's employment, but suspended him because of his three attendance points, pursuant to the attendance policy. (*Id.*, ¶ 11).  Plaintiff was issued two more attendance points for his refusal to work overtime on November 23 and November 26, 2018.  At that point he was terminated because "he exceeded the level of attendance points allowable under the attendance policy." (*Id.*, PageID.669, ¶¶ 14-15).  She concludes by stating, "Mr. Lee's race, refusal to sign the grievance settlement agreement related to his reinstatement in the hi-lo position, his prior complaints to human resources and/or the belief that he may file a discrimination charge played absolutely no role in the decision to terminate his employment."  (*Id.*, ¶ 16).

Plaintiff's written complaint to HR, dated May 11, 2018, complains about not being reinstated to the Hi-Lo position or given the team leader classification. (ECF No. 19-22, PageID.363).  He complains that Chavelle Pete was given the team leader position based on his friendship with James Carrington, and that there

was no rationale for Eddie White or Carol Singleton, who had less seniority, to be selected for the forklift position.  (*Id*., PageID.364).  He writes, "Hiring applicants with less seniority and inadequate training is blatant discrimination." (*Id.*).

Plaintiff's written complaint dated June 27, 2018, alleges that Yvonne Moore, who had less seniority, was working out of classification and was being given job opportunities for which he was denied. (ECF No. 19-23, PageID.366).

## II.   STANDARD OF REVIEW

Rule 56(a) of the Rules of Civil Procedures provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The presence of factual disputes will preclude granting of summary judgment only if the disputes are genuine and concern material facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id*.  Although the Court must view the motion in the light most favorable to the nonmoving party, where "the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Celotex*

14

*Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  Summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.  *Celotex Corp.*, 477 U.S. at 322-23.  A court must look to the substantive law to identify which facts are material.  *Anderson*, 477 U.S. at 248.

## III.   DISCUSSION

### A.   Race Discrimination and Harassment (Counts I and II)

An employment discrimination case under ELCRA is analyzed under the same framework as an analogous claim under Title VII.  *Sutherland v. Michigan Dept. of Treasury,* 344 F.3d 603, 614 (6th Cir.2003); *Cox v. Electronic Data Systems Corp.,* 751 F.Supp. 680, 690 (E.D. Mich.1990); *Nixon v. Celotex Corp.,* 693 F.Supp. 547, 553–54 (W.D. Mich.1988).

Because Plaintiff has presented no evidence that anyone in a decision-making position at Dana made any express race-based comments—and in fact testified that no one had ever done so—his claim must rely on circumstantial evidence. In such case, the burden-shifting approach, first set forth in *McDonnell Douglas Corp. v.*

*Green,* 411 U.S. 792, 93 (1973), applies. *See Johnson v. Kroger Co.,* 319 F.3d 858, 865–66 (6th Cir. 2003). Under that framework, the Plaintiff must present a prima facie case of unlawful discrimination. Once he has done so, the burden shifts to the Defendant to "articulate some legitimate, nondiscriminatory reason" for taking the challenged action. *Johnson v. Univ. of Cincinnati,* 215 F.3d 561, 573 (6th Cir. 2000). If the Defendant satisfies that burden, the Plaintiff must then prove, by a preponderance of the evidence, that the proffered reason for the Defendant's actions is not the true reason, but rather a pretext for discrimination.

### 1.    Prima Facie Case

In order to establish a prima facie showing of discrimination based on indirect evidence under Title VII the Plaintiff must introduce sufficient evidence that (1) he was a member of the protected class, (2) he suffered an adverse employment action, (3) he was qualified for the position, and (4) the adverse action was taken under circumstances giving rise to an inference of unlawful discrimination. *McDonnell Douglas, supra,* 411 U.S. at 802. The last factor is generally shown by evidence that the plaintiff was "treated differently from similarly situated individuals outside of [the] protected class." *Smith v. City of Salem, Ohio,* 378 F.3d 566, 570 (6th Cir. 2004) (*citing Perry v. McGinnis,* 209 F.3d 597, 601 (6th Cir.2000)); *McDonnell Douglas, supra,* 411 U.S. at 802, 1824.

16

Plaintiff meets the first two factors. He is a member of a protected class, and he alleges three adverse actions: the denial of the Hi-Lo position, the denial of the Team Leader position, and his termination.

As to the third factor, the Sixth Circuit has recognized that "[t]o establish that she is qualified for the position, a Title VII plaintiff need only show that she satisfied an employer's 'objective' qualifications." *Upshaw v. Ford Motor Co.,* 576 F.3d 576, 585 (6th Cir. 2009).  As it relates to Plaintiff's overall employment at Dana, he was clearly qualified, and in fact had worked there for many years before he was fired. His qualifications for the Hi-Lo and Team Leader positions present a more difficult question. He crashed the Hi-Lo three times, and when he was offered the ability to again apply for the position if he underwent further training and re-certification, he refused those conditions.  Ms. Koeppe testified that retraining or removal from the position is required when a Hi-Lo worker has a bad safety record. She also testified that the Team Leader position was only available to employees who had not accumulated a certain number of attendance points and other misconducts, and that under those criteria, Plaintiff was not qualified to be considered for the position. Because he did not meet Dana's objective criteria for either position, his prima facie case falters as to these two positions.

But even if Plaintiff is considered qualified for both positions, as well as his general employment at Dana, he has not established the fourth factor—that the adverse actions were taken under circumstances giving rise to an inference of unlawful discrimination. First, it is noteworthy that none of his complaints concerning his employment, including overtime scheduling and his inability to apply for the Hi-Lo or team leader positions, alleged racial discrimination. Rather, they centered on individuals with less seniority. And the majority of the other employees who were allegedly given preferential treatment were, like Plaintiff, African American. This included Mario Harding, Michael Brantley, Ray Hardman, Barris Hawkins, Troy Lee, Devon Williams, Chavelle Pete, Eddie White, and Carolyn Singleton.  Cindy Parks, Art Dreiss, and Ben Hoyston were Caucasian. This would tend to show that whether or not the disparate treatment reflected a sound management practice, it was not based on race. Plaintiff has not presented evidence sufficient to support a prima facie case.

## 2. Pretext

Even assuming that Plaintiff had established a prima facie case, he has not shown that the Defendant's actions were a pretext for discrimination. First, the Defendant has shown a non-discriminatory reason for denying Plaintiff the Hi-Lo and Team Leader positions and for terminating his employment. As to forklift

position, he crashed the Hi-Lo three times, once while he was asleep at the wheel, and declined to undergo safety training and re-certification. As to the Team Leader position, he was disqualified because he had too many disciplinary actions.

Defendant having articulated a legitimate, nondiscriminatory basis for the actions, the burden shifts back to Plaintiff to establish that Defendant's proffered reason is a pretext for discrimination. To establish pretext, a plaintiff must show "'either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [his] discharge, or (3) that they were insufficient to motivate discharge.'" *Russell v. University of Toledo,* 537 F.3d 596, 604 (6th Cir. 2008)(quoting *Manzer v. Diamond Shamrock Chems. Co.,* 29 F.3d 1078, 1084 (6th Cir. 1994)(*overruled on other grounds, Geiger v. Tower Automotive,* 579 F.3d 614 (6th Cir. 2009)).

The Defendant's proffered reason is based in fact. Plaintiff concedes that he had five attendance point when he was fired, which was a sufficient number for termination. He also confirms that he crashed the Hi-Lo three times. Under Dana policy, an employee with four attendance points is subject to termination, so this was sufficient to result in Plaintiff's discharge.

The remaining question, then, is whether the proffered reason was pretextual, and did not actually motivate the Defendant. Plaintiff offers nothing other than

speculation on this point. He never alleged racial discrimination in any of his complaints to HR, and most of the individuals that he complained were getting preferential treatment were African-American.  Plaintiff candidly admitted that when he was assigned mandatory overtime in 2018, he went home instead of showing up for work.  As Ms. Ricevuto testified, an employee who believes he or she has been improperly scheduled does not have the option of simply declining to work, and if they fail to do so, they are assessed an attendance point. She testified that many employees complained about the scheduling, but could not recall a Caucasian employee not receiving discipline for an unexcused absence.  It is undisputed that Plaintiff had five points when he was fired, and Ms. Koeppe testified that the five attendance points constituted the sole reason Plaintiff was fired. Plaintiff has not carried his burden of showing pretext.

### 3.   Hostile Work Environment

To establish prima facie case of hostile work environment under Title VII based on race, the plaintiff must establish that he or she (1) was member of a protected class; (2) was subjected to un-welcomed harassment; (3) the harassment was based on race; (4) the harassment had effect of unreasonably interfering with employee's work performance by creating an intimidating, hostile, or offensive work environment; and (5) the existence of employer liability. *Hafford v. Seider,*

183 F.3d 506, 512 (6th Cir. 1999). In determining whether an environment meets the appropriate threshold, courts look to "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23 (1993). The Supreme Court has made it clear that "'simple teasing,' offhand comments and isolated incidents, (unless extremely serious) will not amount to discriminatory changes in 'the terms and conditions of employment,' "and that "conduct must be extreme to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton,* 524 U.S. 775, 786–89 (1998).

The Sixth Circuit "has established a relatively high bar for what amounts to actionable discriminatory conduct under a hostile work environment theory." *Phillips v. UAW Int'l*, 854 F.3d 323, 328 (6th Cir. 2017). *Phillips* noted that the Sixth Circuit "has found even offensive and bigoted conduct insufficient to constitute a hostile work environment if it is neither pervasive nor severe enough to satisfy the claim's requirements." *Id*.

In this case, Plaintiff alleges a hostile work environment based primarily on the very actions he claims constitute discrimination under Title VII. As discussed in the preceding section, Plaintiff has not provided sufficient non-speculative evidence

that those actions were based on race. As to the claimed improper assignment of overtime, the undisputed evidence is that not only Plaintiff, but many other employees had complaints about overtime scheduling. And while Plaintiff alleges that George Asher, the Production Supervisor, yelled at him and spoke in an "unprofessional" manner, that does not meet the demanding standard for a hostile work environment. Again, Plaintiff testified that none or his supervisors or HR representatives used racially insensitive language.

In sum, Plaintiff has failed to show a genuine issue of material fact as to his Title VII and ELCRA discrimination claims.

## B.   Retaliation (Counts III and IV)

To establish a prima facie case of retaliation, a plaintiff must show that: (1) he engaged in Title VII protected activity; (2) the employer knew that he engaged in that protected activity; (3) the employer subsequently took an adverse employment action against him; and (4) the adverse action was causally connected to the protected activity. *Taylor v. Geithner*, 703 F.3d 328, 336 (6th Cir. 2013). Courts use the *McDonnell Douglas* framework to analyze retaliation claims under Title VII and ELCRA. *See Jackson v. Genesee Cty. Rd. Comm'n*, 999 F.3d 333, 344 (6th Cir. 2021). In both a Title VII and an ELCRA retaliation claim, a plaintiff must show that the "protected activity was a but-for cause of the alleged adverse action by the

22

employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013)(Title VII); *Beard v. AAA of Michigan*, 593 F. App'x 447, 452 (6th Cir. 2014)(ELCRA). In other words, a plaintiff must show that but for his or her protected conduct, the defendant would not have taken the adverse action.

In this case, Plaintiff's retaliation claim is related to the termination of his employment, a clearly adverse action. However, the parties dispute whether Plaintiff engaged in Title VII protected activity. Indeed, at the time of his termination, he had not engaged in such activity, either by filing an EEOC charge or a lawsuit. Instead, Plaintiff argues that the pre-termination November 13, 2018 email from Ms. Ricevuto stating that "[w]e have reason to believe that Ant Lee is preparing a discrimination claim against Dana/UAW" shows that she anticipated protected activity in the future, which in turn satisfies the corresponding prong of the prima facie analysis.

There is no controlling Sixth Circuit authority adopting this theory of "preemptive retaliation" in Title VII cases. In *Sauers v. Salt Lake County*, 1 F.3d 1122 (10th Cir. 1993), the defendant's representative (Cannon) stated in a recorded conversation that he believed the plaintiff would file a sexual harassment complaint in the future. The Tenth Circuit found that this was sufficient to prospectively satisfy the "protected activity" prong of a Title VII retaliation claim:

Plaintiff had not yet taken any action against which Cannon could retaliate, but the tape-recorded conversation between Cannon and Clark indicates his fear that a sexual harassment complaint might soon be filed by plaintiff. Action taken against an individual in anticipation of that person engaging in protected opposition to discrimination is no less retaliatory than action taken after the fact; consequently, we hold that this form of preemptive retaliation falls within the scope of 42 U.S.C. § 2000e–3(a).  Plaintiff demonstrated that she was reassigned against her wishes, satisfying the requirement that an adverse action be taken against her, and the fact that reassignment came just two days after the Cannon–Clark conversation raises an inference that the reassignment was causally connected to Cannon's fear of suit from plaintiff.

*Id.*, at 1128.

In *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561 (3rd Cir. 2002), the Court addressed the anti-retaliation provisions of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12203(b), and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-634.  The plaintiff claimed that he was fired in retaliation for the defendant's incorrect perception that he had assisted his father in a lawsuit against the defendant, when he was in actuality not doing so.[4]  The Court held that the defendant's "perception theory of illegal retaliation—that he was fired

---

[4] Although *Fogleman* was based on the ADA and the ADEA, the Third Circuit noted that its reasoning would be applicable to Title VII cases. "Because the anti-retaliation provisions of the ADA and ADEA are nearly identical, as is the anti-retaliation provision of Title VII, we have held that precedent interpreting any one of these statutes is equally relevant to interpretation of the others." *Id.*, at 567 (citing *Krouse v. American Sterilizer Co.,* 126 F.3d 494, 500 (3d Cir.1997)).

because Mercy *thought* that he was engaged in protected activity, even if he

actually was not—presents a valid legal claim." *Id*. at 565. The Third Circuit went

on to explain:

> [W]e do not believe that the perception theory contradicts the plain text
> of the anti-discrimination statutes. Rather, we read the statutes as
> directly supporting a perception theory of discrimination due to the fact
> that they make it illegal for an employer to "*discriminate* against any
> individual *because* such individual has [engaged in protected
> activity.]" 42 U.S.C. § 12203(a) (emphases added). "Discriminat[ion]"
> refers to the practice of making a decision based on a certain criterion,
> and therefore focuses on the decisionmaker's subjective intent. What
> follows, the word "because," specifies the criterion that the employer is
> prohibited from using as a basis for decisionmaking. The laws,
> therefore, focus on the employer's subjective reasons for taking
> adverse action against an employee, so it matters not whether the
> reasons behind the employer's discriminatory animus are actually
> correct as a factual matter.

*Id*. at 571. The Court then analogized to a hypothetical Title VII case:

> As an illustration by analogy, imagine a Title VII discrimination case
> in which an employer refuses to hire a prospective employee because
> he thinks that the applicant is a Muslim. The employer is still
> discriminating on the basis of religion even if the applicant he refuses
> to hire is not in fact a Muslim. What is relevant is that the applicant,
> whether Muslim or not, was treated worse than he otherwise would
> have been for reasons prohibited by the statute. We have adopted this
> same approach in the labor law context, where we have consistently
> held that an employer's discharge of an employee for discriminatory
> reasons amounts to illegal retaliation even if it is based on the
> employer's mistaken belief that the employee engaged in protected
> activity. *See Fogarty v. Boles,* 121 F.3d 886, 891 (3d Cir.1997); *Brock
> v. Richardson,* 812 F.2d 121, 125 (3d Cir.1987).

25

> Accordingly, we hold that if Greg can show, as he claims, that adverse action was taken against him because Mercy thought that he was assisting his father and thereby engaging in protected activity, it does not matter whether Mercy's perception was factually correct.

*Id*. at 571-572.  *See also Scott v. Napolitano*, 717 F. Supp. 2d 1071, 1091 (S.D. Cal. 2010)(" If [defendant] mistakenly thought Plaintiff was opposing discrimination prohibited by Title VII, Plaintiff arguably would have a retaliation claim under Title VII.")(citing *Fogleman*).  The Sixth Circuit has not addressed the perception theory of retaliation in Title VII cases, but it noted that theory in *Dye v. Off. of the Racing Comm'n*, 702 F.3d 286 (6th Cir. 2012), a First Amendment case holding that "retaliation based on perceived political affiliation is actionable under the political-affiliation retaliation doctrine." *Id*. at 300.

Given the remedial nature of Title VII, the Tenth Circuit's reasoning in *Sauers* is persuasive. Dana's subjective belief that Plaintiff was poised to file an EEOC charge or a lawsuit, even though he had not yet done so, is sufficient to satisfy the protected conduct prong of a Title VII retaliation claim.

However, Plaintiff's prima facie case falters on the causation prong because he has not shown that Dana would not have terminated him but for its perception that he was going to engage in protected activity. As discussed in the preceding section, Plaintiff had five disciplinary attendance points.  While he believed that he was unfairly assigned to mandatory overtime, he admits that he did not show up to

work as required, resulting in attendance points under Dana's policies.  Having five points, based on Plaintiff's admitted misconduct, was sufficient in itself to result in his termination.  Because Plaintiff has not shown that the "protected activity was a but-for cause of the alleged adverse action by the employer," *Nassar*, 570 U.S. at 362, Defendant is granted summary judgment on the retaliation claims.

## C.    Violation of Public Policy (Count V)

Plaintiff alleges that Defendant Dana "violated Michigan Public Policy by firing him because he refused to sign the settlement agreement and waive his rights to file a discrimination lawsuit." (ECF No. 21, PageID.430). This claim fails for three reasons.

First, nothing in the language of the settlement agreement prohibits Plaintiff from filing a lawsuit.  Plaintiff points only to bullet point five, which states, "The parties understand that this is a non-precedent and non-prejudice settlement."  This cannot reasonably be interpreted to mean that by entering into the agreement, Plaintiff would be waiving his right to pursue legal action.

Second, Plaintiff was not fired because he refused to sign the agreement. He was fired because he amassed five attendance points.

Third, and most importantly, "[a] public policy claim is sustainable…only where there also is not an applicable statutory prohibition against discharge in

retaliation for the conduct at issue." *Dudewicz v. NorrisSchmid, Inc.,*

443 Mich. 68, 79–80, 503 N.W.2d 645 (1993), overruled in part on other

grounds, *Brown v. Detroit Mayor,* 478 Mich. 589, 734 N.W.2d 514 (2007). *See also*

*Sulieman v. St. John Hosp. & Med. Ctr.*, 2009 WL 10680532, at *7 (E.D. Mich.

June 26, 2009)("The Michigan Supreme Court has found that claims

of retaliation based on public policy are only permitted when there is no statutory

prohibition against the retaliation.  Under the [ELCRA] an employer is prohibited

from retaliating or discriminating against a person who has opposed any violation

of the act.  Therefore, Plaintiff's exclusive remedy is to bring a claim

of retaliation under the applicable state statute, and his public policy claim is

dismissed.")(internal citations omitted).  Defendant is accordingly entitled to

summary judgment on his violation of public policy claim.

## IV.   CONCLUSION/ORDER

For the reasons set forth above,

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment

(ECF No. 19) is GRANTED.

IT IS FURTHER ORDERED that this action is DISMISSED and designated as CLOSED on the Court's docket.


s/Denise Page Hood
DENISE PAGE HOOD
UNITED STATES DISTRICT JUDGE

DATED:  September 30, 2024